## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

**LEE SIUZDAK**                          :
     **Plaintiff**                 :    **CIVIL ACTION NO.**
                  :
**v.**                                   :
                  :
**GREATER BRIDGEPORT**                    :    **APRIL 18, 2005**
**COMMUNITY MENTAL HEALTH CTR:**
     **Defendant**                 :
_____:

## <u>COMPLAINT</u>

### <u>Jurisdiction and Venue</u>

1.    This action arises under the Americans with Disabilities Act of 1990, as amended, as codified at 42 U.S.C. § 12101 *et seq.*, the Family & Medical Leave Act as codified at 29 U.S.C. § 2601 *et seq.*, the Connecticut Fair Employment Practices Act as codified at Conn. Gen. Stat. § 46a-60 *et seq.*, the Connecticut Family & Medical Leave Act as codified at Conn. Gen. Stat. § 31-51pp, and state common law.

2.    The jurisdiction of the Court is founded upon 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343.

3.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) in that the claim arose in this district and that the Plaintiff resided in this district at the time of the incident.

4.    Supplemental jurisdiction over the Plaintiff's supplemental state law claims is invoked pursuant to 28 U.S.C. § 1367 as the claims arise out of the same transaction and occurrences as the Plaintiff's federal claims.

PDF created with pdfFactory trial version www.pdffactory.com

5.     Costs, expert witness fees, and attorney fees are sought pursuant to 42 U.S.C. § 1988.

6.     The Plaintiff filed a timely claim with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC).

7.     The Plaintiff received a "Release of Jurisdiction" from the CHRO on January 19, 2005 and on January 12, 2005 received notice that the EEOC had referred the matter to the U.S. Department of Justice.

### The Plaintiff

8.     During the relevant time period, as well as currently, the Plaintiff Lee Siuzdak was a resident of the city of Naugatuck and the State of Connecticut.

9.     The Plaintiff is disabled due to Bipolar Disorder.

10.    The Plaintiff is disabled due to an Avulsion Fracture.

### The Defendant

11.    The Defendant, Greater Bridgeport Community Mental Health Center ("GBCMHC"), is located at 1635 Central Avenue, Bridgeport, Connecticut.

### Preliminary Statement

12.    The Plaintiff seeks by this action to recover for disability discrimination, retaliation, promissory estoppel, misrepresentation, negligent misrepresentation,   negligent infliction of emotional distress, and libel, in violation of the Americans with Disabilities Act of 1990, as amended, as codified at 42 U.S.C. § 12101 *et seq*., the Family & Medical Leave Act as codified at 29 U.S.C. § 2601 *et seq*., the Connecticut Fair Employment Practices Act as codified at Conn. Gen. Stat. § 46a-

2

PDF created with pdfFactory trial version www.pdffactory.com

60 *et seq.*, the Connecticut Family & Medical Leave Act as codified at Conn. Gen.

Stat. § 31-51pp, and state common law.

**Facts**

13.   In 1982 the Plaintiff was hospitalized for over a year and diagnosed with Bi-polar
      Disorder.

14.   The Plaintiff has maintained her Bipolar Disorder with continuous treatment,
      medication and therapy.

15.   Despite her treatment and medication compliance, the Plaintiff suffers from
      episodes of persistent and unremitting thoughts of self-harm and suicide.

16.   On or about July 27, 2001, the Plaintiff was hired by the GBCMHC as a per diem
      Registered Nurse (RN).

17.   Throughout her employment with the Defendant, the Plaintiff performed her duties
      in an above average manner.

18.   The Plaintiff received a performance evaluation on September 13, 2002 by Irvin
      Pemberton, Nursing Supervisor, and received an overall rating of "Good".

19.   While the Plaintiff served as a per diem RN, the Defendant assigned her, almost
      exclusively, to fill the position of Charge Nurse, in lieu of assigning that duty to
      other scheduled per diem RNs.

20.   Shortly after hire, many employees of the Defendant, including management-level
      personnel, began repeatedly asking the Plaintiff to work full-time for the Defendant
      as a Head Nurse in one of the facility's psychiatric intensive care units.

21.   On or about February 2003, the Plaintiff accepted the full-time Head Nurse
      position.

PDF created with pdfFactory trial version www.pdffactory.com

22.   On or about April 1, 2003, after approximately one month into her new position as Head Nurse, the Plaintiff suffered an Avulsion Fracture of her right greater trochanter, with subsequent chronic Iliopsoas and Trocanteric Bursitis.

23.   As a result of the injury to her hip, the Plaintiff was out of work for approximately six (6) weeks.

24.   On or about May 26, 2003, the Plaintiff was released, by her doctor, to part-time full-duty status, to increase as tolerated.

25.   The Defendant does not permit light-duty positions in the psychiatric intensive care units.

26.   Due to the lack of light-duty positions, the Plaintiff initially worked full eight-hour shifts, but only two days per week.

27.   Immediately upon her return from medical leave, Irvin Pemberton, Nursing Supervisor, began to harass the Plaintiff by repeatedly asking her in a sarcastic tone, "when are you going to work this week?"

28.   Over the next three weeks, the Plaintiff gradually increased her schedule to three days per week.

29.   The Plaintiff informed Maria-Elena Kelly, the seventh floor medication nurse, and Jim Randazise, a mental health worker, of her Bipolar Disorder.

30.   Thereafter, the Plaintiff informed Carol Collins, the fifth floor Evening Head Nurse, of her Bipolar Disorder.

31.   Maria-Elena Kelly informed Terri van Slyke, Night Nursing Supervisor, that the Plaintiff suffers from Bipolar Disorder.

PDF created with pdfFactory trial version www.pdffactory.com

32.     The Plaintiff's medication has numerous apparent side effects, including, but not limited to potential: Ataxia, loss of balance; Diplopia, crossing of the eyes; occasional slurred speech; and orthostatic hypotension, rapid decrease of blood pressure upon standing.

33.     The Plaintiff feared that her staff could view these symptoms as intoxication and therefore, on or about the beginning of June 2003, during a staff meeting, the Plaintiff advised her regular staff that she was on medication for a seizure disorder.

34.     During the meeting, Adrienne Mihalik was very interested in the Plaintiff's condition and asked many questions.

35.     After the conclusion of the meeting, Maria-Elena Kelly informed Adrienne Mihalik and Pat McGargle that the Plaintiff suffers from Bipolar Disorder.

36.     Consistently, from the Plaintiff's return from medical leave, the Defendant began to intentionally create a hostile work environment.

37.     The Plaintiff's subordinates were pulled into Supervisors' offices and harassed.

38.     When the Plaintiff's subordinates returned to the intensive care unit, they were so upset, that they refused to perform any duties "not included in their job descriptions".

39.     Almost immediately upon the Plaintiff's return from medical leave, Elizabeth Hurley, Evening Nursing Supervisor, began visiting the seventh floor during the Plaintiff's shift requiring the Plaintiff to complete paperwork, while there were many other more pressing concerns to attend to.

40.     After this hostile work environment was created by Ms. Hurley and the Supervisors, Ms. Hurley accused the Plaintiff of being unable to control the floor.

PDF created with pdfFactory trial version www.pdffactory.com

41. The Plaintiff had numerous conversations with Human Resources regarding her pay rate.

42. The Plaintiff, as a full-time Head Nurse, earned $26.39 per hour, while per diem RNs earned $41.00 per hour.

43. As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

44. The Plaintiff, therefore, spoke with Jennifer Green, the Personnel Officer, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

45. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

46. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

47. During the Plaintiff's final two (2) weeks as Head Nurse, her appointment book, which contained all of her medical and therapy appointments, disappeared and then reappeared over a week later.

48. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

49. Maxim assigned the Plaintiff to a variety of RN positions at different locations, including another Department of Mental Health & Addiction Services (DMHAS)

PDF created with pdfFactory trial version www.pdffactory.com

located in New Haven, Connecticut and a state correctional facility in Bridgeport, Connecticut.

50.    When the two-week waiting period for reinstatement had expired, the Plaintiff telephoned the Defendant to request her assignment.

51.    The Plaintiff was informed that Ms. Green was on vacation and would be for an additional three (3) weeks and that the Plaintiff's reinstatement could not occur until Ms. Green returned.

52.    While the Plaintiff awaited Ms. Green's return, and her subsequent reinstatement, she continued to receive per diem assignments through Maxim.

53.    One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

54.    However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned her and informed her that her shift had been cancelled.

55.    The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating, "Please be advised effective immediately, Lee Siuzdak is not to be used as an RN in the building.  Should there be any question relating to this matter contact Gary Siegel in HR department."

56.    No further explanation was provided for this e-mail.

57.    The Connecticut Department of Mental Health and Addiction Services prohibits use of the e-mail system or computer equipment in such a way as to be disruptive or offensive to others.

PDF created with pdfFactory trial version www.pdffactory.com

58.     There is no non-discriminatory justification for this e-mail and therefore its purpose was to be disruptive to the Plaintiff.

59.     The Plaintiff immediately contacted Gary Siegel, Director of Human Resources, and inquired into the meaning of the e-mail that was sent to Maxim and she was advised that he would look into it.

60.     After several telephone calls to Mr. Siegel, the Plaintiff was finally informed that Miriam Olack, Director of Inpatient Services, told Gary Siegel that the Plaintiff had walked off the job.

61.     The Plaintiff attempted, to no avail, to explain to Mr. Siegel that she had not walked off the job; this was later verified by Ms. Green.

62.     After Ms. Green returned from vacation and the supposed miscommunication concerning the Plaintiff allegedly walking off the job was rectified, the Plaintiff expected to be reinstated as a per diem RN, however the Plaintiff was falsely informed that the Defendant was not hiring per diem RNs.

63.     At the same time the Defendant claimed to not be hiring per diem RNs, there were vacancy postings for per diem RNs, including one on September 11, 2003 for three (3) RN positions at GBCMHC.

64.     The Plaintiff also questioned Ms. Green concerning the e-mail that was sent to Maxim by Irvin Pemberton.

65.     Ms. Green advised the Plaintiff that she would look into it, but she never returned the Plaintiff's telephone call or otherwise corrected the e-mail.

PDF created with pdfFactory trial version www.pdffactory.com

66.   After the Plaintiff placed numerous telephone calls to Ms. Green, which went unreturned, the Plaintiff finally spoke with Ms. Olack, who stated that Ms. Green was in a meeting and would call her back; the Plaintiff never received a response.

67.   After communication with Ms. Green proved unsuccessful, the Plaintiff made contact with Irvin Pemberton and inquired why she had not been reinstated as a per diem RN.

68.   Mr. Pemberton knew that the Defendant was hiring per diems at that time when he stated that it was not.

**Count One:       Violation of the Americans with Disabilities Act for Discrimination Based on Bipolar Disorder**

69.   The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

70.   The Plaintiff suffers from Bipolar Disorder and therefore has a mental impairment.

71.   The Plaintiff's mental impairment substantially limits her ability to remain alive, to think, to communicate, and to interact with others, and she is therefore disabled.

72.   The Plaintiff is able to perform the essential functions of her job and is therefore a qualified individual with a disability.

73.   The Defendant is aware of the Plaintiff's disability, in the following ways:

   a.   The Plaintiff was an employee at a mental health facility, whose employees' jobs it is to identify the symptoms of mental impairments.

   b.   The Plaintiff's medication has numerous apparent side effects.

   c.   The Plaintiff informed Maria-Elena Kelly, Carol Collins, and Jim Randazise of her Bipolar Disorder.

PDF created with pdfFactory trial version www.pdffactory.com

d.      Maria-Elena Kelly informed Adrienne Mihalik, Pat McGargle,

and Terri van Slyke that the Plaintiff suffers from Bipolar Disorder.

74.     Shortly after the Defendant learned of the Plaintiff's disability, it began to

intentionally create a hostile work environment, in order to create animosity

amongst the Plaintiff's subordinates, as means to force her resignation.

75.     As result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to

pay her bills earning only $26.39 per hour.

76.     The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could

return as a per diem RN, but that reinstatement would take two (2) weeks.

77.     Jennifer Greene had actual authority, or reasonably appeared to be clothed with

actual authority, to commit the Defendant to this promise.

78.     As a result of the acts and actions referred to in paragraphs thirty-six through

forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but

continued to perform the position of Head Nurse for two (2) additional weeks

through June 27, 2003.

79.     As a means of employment during the Plaintiff's anticipated return to work as a

per diem RN, the Plaintiff began working through a job placement agency, Maxim.

80.     One of the Plaintiff's assignments from Maxim was an RN position at the

GBCMHC.

81.     However, before the Plaintiff reported for the assignment at GBCMHC, a

representative from Maxim telephoned and informed her that her shift had been

cancelled.

82.     The Plaintiff was further advised by the Maxim representative that Irvin Pemberton

PDF created with pdfFactory trial version www.pdffactory.com

sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

83. The Plaintiff was refused reinstatement allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

84. The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, and therefore discriminated against her in regard to hiring, because of her disability.

85. The Defendant's conduct is unlawful and in violation of § 12112(a) of the ADA.

86. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

87. The Defendant was aware or reasonably should have been aware that its actions constituted a violation of the ADA.

88. The Defendant acted with malice and/or in reckless disregard of the Plaintiff's federally protected rights.

89. As a result of the Defendant's malice and/or reckless disregard, the Plaintiff is entitled to punitive damages.

90. The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Two:**          **Violation of the Americans with Disabilities Act for Discrimination Based on Fractured Hip**

91. The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

92. The Plaintiff suffers from an Avulsion Fracture, with subsequent chronic Iliopsoas

11

PDF created with pdfFactory trial version www.pdffactory.com

and Trocanteric Bursitis, and therefore has a chronic physical impairment.

93. The Plaintiff's physical impairment significantly restricts the condition, manner and duration under which she may sit or work, and she is therefore disabled.

94. The Plaintiff is able to perform the essential functions of her job and is therefore a qualified individual with a disability.

95. Upon fundamental observation of the Plaintiff, it is clear that she is not limited in her ability to walk or stand;  the Plaintiff is only limited in her ability to sit and work and therefore is qualified to perform the essential functions of her job.

96. The Defendant is aware of the Plaintiff's disability, in the following ways:

    a.    As a result of the injury to her hip, the Plaintiff was out of work for approximately six (6) weeks.

    b.    The Plaintiff provided medical documentation to staffing office, in order to substantiate both her injury and her subsequent medical restrictions.

    c.    Upon return from medical leave, the Plaintiff initially worked full eight-hour shifts, but only two days per week.

97. Immediately upon her return from leave, Irvin Pemberton, began to harass the Plaintiff by repeatedly asking her in a sarcastic tone, "when are you going to work this week?"

98. After the Plaintiff returned from medical leave, the Defendant began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

99. As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

12

PDF created with pdfFactory trial version www.pdffactory.com

100. The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

101. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

102. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

103. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

104. One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

105. However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned and informed her that her shift had been cancelled.

106. The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

107. The Plaintiff was refused reinstatement allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

108. The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, and therefore discriminated against her in regard to hiring, because of her disability.

109. The Defendant's conduct is unlawful and in violation of § 12112(a) of the ADA.

PDF created with pdfFactory trial version www.pdffactory.com

110. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

111. The Defendant was aware or reasonably should have been aware that its actions constituted a violation of the ADA.

112. The Defendant acted with malice and/or in reckless disregard of the Plaintiff's federally protected rights.

113. As a result of the Defendant's malice and/or reckless disregard, the Plaintiff is entitled to punitive damages.

114. The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Three:**       <u>**Violation of the Americans with Disabilities Act for Discrimination Based on Bipolar Disorder, Regarded As**</u>

115. The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

116. The Plaintiff suffers from Bipolar Disorder and therefore has a mental impairment.

117. The Defendant is aware of the Plaintiff's mental impairment in the following ways:

     a.    The Plaintiff was an employee at a mental health facility, whose employees' jobs it is to identify the symptoms of mental impairments.

     b.    The Plaintiff's medication has numerous apparent side effects.

     c.    The Plaintiff informed Maria-Elena Kelly, Carol Collins, and Jim Randazise of her Bipolar Disorder.

     d.    Maria-Elena Kelly informed Adrienne Mihalik, Pat McGargle, and Terri

14

PDF created with pdfFactory trial version www.pdffactory.com

van Slyke that the Plaintiff suffers from Bipolar Disorder.

118. After the Defendant learned of the Plaintiff's mental impairment and believed that it substantially limited her ability to work, think, communicate, and interact with others, it began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

119. As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

120. The Plaintiff, therefore, spoke with Jennifer Green, the Human Resource Generalist, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

121. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

122. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

123. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

124. One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

125. However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned and informed her that her shift had been

15

PDF created with pdfFactory trial version www.pdffactory.com

cancelled.

126.    The Plaintiff was further advised by the Maxim representative that Irvin Pemberton

sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

127.    The Plaintiff was refused reinstatement allegedly because the Defendant was not

hiring per diem RNs, however at the same time it was advertising to hire RNs.

128.    The Defendant mistakenly believes that the Plaintiff's mental impairment

substantially limits her ability to work, think, communicate, and interact with

others, and she is therefore disabled.

129.    The Plaintiff is able to perform the essential functions of her job and is therefore a

qualified individual with a disability.

130.    The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its

inducement to resign her position, and therefore discriminated against her in regard

to hiring, because of her disability.

131.    The Defendant's conduct is unlawful and in violation of § 12112 of the ADA.

132.    As a result of the foregoing unlawful conduct, the Plaintiff suffered and will

continue to suffer damages including, but not limited to, lost wages and benefits,

reputation damage, emotional and psychological stress, distress, anxiety and loss

of the ability to enjoy life's pleasures.

133.    The Defendant was aware or reasonably should have been aware that its actions

constituted a violation of the ADA.

134.    The Defendant acted with malice and/or in reckless disregard of the Plaintiff's

federally protected rights.

135.    As a result of the Defendant's malice and/or reckless disregard, the Plaintiff is

PDF created with pdfFactory trial version www.pdffactory.com

entitled to punitive damages.

136.  The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Four:**  **Violation of the Americans with Disabilities Act for Discrimination Based on Fractured Hip, Regarded As**

137.  The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

138.  The Plaintiff suffered an Avulsion Fracture, with subsequent chronic Iliopsoas and Trocanteric Bursitis, and therefore has a physical impairment.

139.  The Defendant is aware of the Plaintiff's physical impairment in the following ways:

  a.  As a result of the injury to her hip, the Plaintiff was out of work for approximately six (6) weeks.

  b.  The Plaintiff provided medical documentation to the staffing office, in order to substantiate both her injury and subsequent medical restrictions.

  c.  Upon return from medical leave, the Plaintiff initially worked full eight-hour shifts, but only two days per week.

140.  After the Defendant learned of the Plaintiff's physical impairment and believed that it substantially limited her ability to sit, stand, walk, and work, it began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

141.  As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

142.  The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could

PDF created with pdfFactory trial version www.pdffactory.com

return as a per diem RN, but that reinstatement would take two (2) weeks.

143. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

144. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

145. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

146. One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

147. However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned and informed her that her shift had been cancelled.

148. The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

149. The Plaintiff was refused reinstatement allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

150. The Defendant mistakenly believes that the Plaintiff's physical impairment substantially limits her ability to sit, stand, walk, and work and she is therefore disabled.

151. The Plaintiff is able to perform the essential functions of her job and is therefore a qualified individual with a disability.

PDF created with pdfFactory trial version www.pdffactory.com

152.    Upon fundamental observation of the Plaintiff, it is clear that she is not limited in her ability to walk or stand;  the Plaintiff is only limited in her ability to sit and work and therefore is qualified to perform the essential functions of her job.

153.    The Defendant failed to reinstate the Plaintiff as a per diem RN and therefore discriminated against her in regard to hiring, because of her disability.

154.    The Defendant's conduct is unlawful and in violation of § 12112 of the ADA.

155.    As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

156.    The Defendant was aware or reasonably should have been aware that its actions constituted a violation of the ADA.

157.    The Defendant acted with malice and/or in reckless disregard of the Plaintiff's federally protected rights.

158.    As a result of the Defendant's malice and/or reckless disregard, the Plaintiff is entitled to punitive damages.

159.    The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Five:**          **Discrimination on the Basis of Bipolar Disorder in Violation of Conn. Gen. Stat. 46a-60(a)(1)**

160.    The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

161.    The Plaintiff is mentally disabled in that she suffers from Bipolar Disorder, and therefore has a record and is regarded as having a mental disorder.

PDF created with pdfFactory trial version www.pdffactory.com

162.   The Plaintiff is able to perform the essential functions of her position and is therefore a qualified individual with a disability.

163.   The Defendant is aware of the Plaintiff's disability, in the following ways:

    a.   The Plaintiff was an employee at a mental health facility, whose employees' jobs it is to identify the symptoms of mental impairments.

    b.   The Plaintiff's medication has numerous apparent side effects.

    c.   The Plaintiff informed Maria-Elena Kelly, Carol Collins, and Jim Randazise of her Bipolar Disorder.

    d.   Maria-Elena Kelly informed Adrienne Mihalik, Pat McGargle, and Terri van Slyke that the Plaintiff suffers from Bipolar Disorder.

164.   After the Defendant learned of the Plaintiff's disability, it began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

165.   As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

166.   The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

167.   Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

168.   As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

PDF created with pdfFactory trial version www.pdffactory.com

169. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

170. One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

171. However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned and informed her that her shift had been cancelled.

172. The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

173. The Plaintiff was refused reinstatement allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

174. The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, and therefore discriminated against her in regard to hiring, because of her disability.

175. The Defendant's conduct is unlawful and in violation of Conn. Gen. Stat. § 46a-60(a)(1).

176. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

177. The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Six:**          **Discrimination on the Basis of Fractured Hip in Violation of Conn. Gen. Stat. 46a-60(a)(1)**

PDF created with pdfFactory trial version www.pdffactory.com

178.   The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

179.   The Plaintiff suffers from a fractured hip, a chronic physical impairment, resulting from bodily injury, and is therefore physically disabled.

180.   The Plaintiff is able to perform the essential functions of her position and is therefore a qualified individual with a disability.

181.   Upon fundamental observation of the Plaintiff, it is clear that she is not limited in her ability to walk or stand;  the Plaintiff is only limited in her ability to sit and work and therefore is qualified to perform the essential functions of her job.

182.   The Defendant is aware of the Plaintiff's disability, in the following ways:

   a.   As a result of the injury to her hip, the Plaintiff was out of work for approximately six (6) weeks.

   b.   The Plaintiff provided medical documentation to the staffing office, in order to substantiate both her injury and subsequent medical restrictions.

   c.   Upon return from medical leave, the Plaintiff initially worked full eight-hour shifts, but only two days per week.

183.   Immediately upon her return from leave, Irvin Pemberton, began to harass the Plaintiff by repeatedly asking her in a sarcastic tone, "when are you going to work this week?"

184.   After the Defendant learned of the Plaintiff's disability, it began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

185.   As a result of the Plaintiff's reduced work schedule, as a result of her chronic

PDF created with pdfFactory trial version www.pdffactory.com

impairment, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

186. The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

187. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

188. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

189. As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

190. One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

191. However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned and informed her that her shift had been cancelled.

192. The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating the Plaintiff may not be assigned to the GBCMHC.

193. The Plaintiff was refused reinstatement allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

194. The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, and therefore discriminated against her in regard

PDF created with pdfFactory trial version www.pdffactory.com

to hiring, because of her disability.

195.    The Defendant's conduct is unlawful and in violation of Conn. Gen. Stat. § 46a-60(a)(1).

196.    As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

197.    The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Seven:**          **Retaliation in Violation of the Family and Medical Leave Act**

198.    The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

199.    The Plaintiff was hired by the GBCMHC on July 27, 2001.

200.    The Plaintiff suffered an Avulsion Fracture, a fractured hip, on or about April 1, 2002.

201.    The Avulsion Fracture was an injury that involves continuing treatment by a health care provider, and is therefore a serious health condition.

202.    At the time the Plaintiff was injured, she had been employed by the Defendant for at least twelve months.

203.    At the time the Plaintiff was injured, she had worked for at least 1,250 hours of service with the Defendant during the twelve-month period directly preceding her first day of leave.

204.    The Defendant employs over fifty (50) employees at the GBCMHC.

205.    The Plaintiff is an eligible employee under the Family and Medical Leave Act.

PDF created with pdfFactory trial version www.pdffactory.com

206. As an eligible employee, the Plaintiff took approximately six (6) weeks of leave.

207. Immediately upon her return from leave, the Defendant began its pattern and scheme of retaliation against the Plaintiff as a result of her taking medical leave.

208. Irvin Pemberton, began to harass the Plaintiff by repeatedly asking her in a sarcastic tone, "when are you going to work this week?"

209. After the Plaintiff's returned from medical leave, the Defendant began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

210. The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

211. Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

212. As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

213. The Plaintiff was refused reinstatement to the position of a per diem RN, allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

214. The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, in retaliation for taking her statutorily protected medical leave.

215. The Defendant's conduct is unlawful and in violation of § 2615 of the Family and

PDF created with pdfFactory trial version www.pdffactory.com

Medical Leave Act.

216. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits, reputation damage, emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures.

217. The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Eight:**  **Retaliation in Violation of the Connecticut Family and Medical Leave Act**

218. The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

219. The Plaintiff was hired by the GBCMHC on June 27, 2001.

220. The Plaintiff suffered an Avulsion Fracture, a fractured hip, on or about April 1, 2002.

221. The Avulsion Fracture was an injury that involves continuing treatment by a health care provider, and is therefore a serious health condition.

222. At the time the Plaintiff was injured, she had been employed by the Defendant for at least twelve months.

223. At the time the Plaintiff was injured, she had worked for at least 1,000 hours of service with the Defendant during the twelve-month period directly preceding her first day of leave.

224. The Defendant employs over seventy-five (75) employees at the GBCMHC.

225. The Plaintiff is an eligible employee under the Connecticut Family and Medical Leave Act.

PDF created with pdfFactory trial version www.pdffactory.com

226.  As an eligible employee, the Plaintiff took approximately six (6) weeks of leave.

227.  Immediately upon her return from leave, the Defendant began its pattern and scheme of retaliation against the Plaintiff as a result of her taking medical leave.

228.  Irvin Pemberton, began to harass the Plaintiff by repeatedly asking her in a sarcastic tone, "when are you going to work this week?"

229.  After the Plaintiff's returned from medical leave, the Defendant began to intentionally create a hostile work environment, in order to create animosity amongst the Plaintiff's subordinates, as means to force her resignation.

230.  The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

231.  Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this promise.

232.  As a result of the acts and actions referred to in paragraphs thirty-six through forty-five, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

233.  The Plaintiff was refused reinstatement to the position of per diem RN, allegedly because the Defendant was not hiring per diem RNs, however at the same time it was advertising to hire RNs.

234.  The Defendant failed to reinstate the Plaintiff as a per diem RN, despite its inducement to resign her position, in retaliation for taking her statutorily protected medical leave.

235.  The Defendant's conduct is unlawful and in violation of § 31-51pp of the

PDF created with pdfFactory trial version www.pdffactory.com

Connecticut Family and Medical Leave Act.

236.    As a result of the foregoing unlawful conduct, the Plaintiff suffered and will
        continue to suffer damages including, but not limited to, lost wages and benefits,
        reputation damage, emotional and psychological stress, distress, anxiety and loss
        of the ability to enjoy life's pleasures.

237.    The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Nine:**          **Promissory Estoppel**

238.    The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more
        fully set forth herein at length.

239.    Shortly after hire, many employees of the Defendant, including management-level
        personnel, began repeatedly asking the Plaintiff to work full-time for the Defendant
        as a Head Nurse on one of the facility's psychiatric intensive care units.

240.    On or about February 2003, the Plaintiff accepted the full-time Head Nurse
        position.

241.    The Plaintiff, as a full-time Head Nurse, earned $26.39 per hour, while per diem
        RNs earned $41.00 per hour.

242.    As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford
        to pay her bills earning only $26.39 per hour.

243.    The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could
        return as a per diem RN, but that reinstatement would take two (2) weeks.

244.    Jennifer Greene had actual authority, or reasonably appeared to be clothed with
        actual authority, to commit the Defendant to this promise.

245.    The promise was reasonably expected to induce reliance by the Plaintiff.

PDF created with pdfFactory trial version www.pdffactory.com

246.    The Plaintiff relied on this promise.

247.    In reliance upon Ms. Green's promise, the Plaintiff officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

248.    The Defendant breached its promise by refusing to reinstate the Plaintiff to the position of per diem RN, despite its inducement to resign her position.

249.    The Plaintiff relied on this promise to her detriment.

250.    As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits and reputation damage.

251.    The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Ten:**          **Misrepresentation**

252.    The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

253.    Shortly after hire, many employees of the Defendant, including management-level personnel, began repeatedly asking the Plaintiff to work full-time for the Defendant as a Head Nurse on one of the facility's psychiatric intensive care units.

254.    On or about February 2003, the Plaintiff accepted the full-time Head Nurse position.

255.    The Plaintiff, as a full-time Head Nurse, earned $26.39 per hour, while per diem RNs earned $41.00 per hour.

256.    As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

PDF created with pdfFactory trial version www.pdffactory.com

257.   The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

258.   Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this representation.

259.   This false representation was made as a statement of fact.

260.   This representation was untrue and Ms. Green knew that it was untrue, in the following ways:

   a.   Ms. Green knew that the Plaintiff could not be reinstated in two weeks because she knew that only she could reinstate the Plaintiff and Ms. Green knew that she would be on vacation in two weeks, including the date on which she claimed the Plaintiff would be reinstated; and

   b.   Ms. Green knew that the Defendant had no intention to reinstate the Plaintiff as a per diem RN.

261.   The Plaintiff relied on this representation and officially resigned as Head Nurse on June 13, 2003, but continued to perform the position of Head Nurse for two (2) additional weeks through June 27, 2003.

262.   The Defendant failed to reinstate the Plaintiff as a per diem RN, thereby injuring the Plaintiff.

263.   As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits and reputation damage.

264.   The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Eleven:**       **Negligent Misrepresentation**

PDF created with pdfFactory trial version www.pdffactory.com

265.     The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

266.     Shortly after hire, many employees of the Defendant, including management-level personnel, began repeatedly asking the Plaintiff to work full-time for the Defendant as a Head Nurse on one of the facility's psychiatric intensive care units.

267.     On or about February 2003, the Plaintiff accepted the full-time Head Nurse position.

268.     The Plaintiff, as a full-time Head Nurse, earned $26.39 per hour, while per diem RNs earned $41.00 per hour.

269.     As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford to pay her bills earning only $26.39 per hour.

270.     The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could return as a per diem RN, but that reinstatement would take two (2) weeks.

271.     Jennifer Greene had actual authority, or reasonably appeared to be clothed with actual authority, to commit the Defendant to this representation.

272.     This false representation was made as a statement of fact.

273.     This representation was untrue and Ms. Green knew or reasonably should have known that it was untrue, in the following ways:

     a.     Ms. Green reasonably should have known that the Plaintiff could not be reinstated in two weeks because she knew that only she could reinstate the Plaintiff and Ms. Green knew that she would be on vacation in two weeks, including the date on which she claimed the Plaintiff would be reinstated;

31

PDF created with pdfFactory trial version www.pdffactory.com

and

b.     Ms. Green reasonably should have known that the Defendant had no

intention to reinstate the Plaintiff as a per diem RN.

274.   The Plaintiff relied on this representation and officially resigned as Head Nurse on

June 13, 2003, but continued to perform the position of Head Nurse for two (2)

additional weeks through June 27, 2003.

275.   The Defendant failed to reinstate the Plaintiff as a per diem RN, thereby injuring

the Plaintiff.

276.   As a result of the foregoing unlawful conduct, the Plaintiff suffered and will

continue to suffer damages including, but not limited to, lost wages and benefits

and reputation damage.

277.   The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

**Count Twelve:**       **Negligent Infliction of Emotional Distress**

278.   The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more

fully set forth herein at length.

279.   On or about February 2003, the Plaintiff accepted the full-time Head Nurse

position.

280.   The Plaintiff, as a full-time Head Nurse, earned $26.39 per hour, while per diem

RNs earned $41.00 per hour.

281.   As a result of the Plaintiff's reduced work schedule, the Plaintiff could not afford

to pay her bills earning only $26.39 per hour.

282.   The Plaintiff, therefore, spoke with Jennifer Green, who told her that she could

return as a per diem RN, but that reinstatement would take two (2) weeks.

PDF created with pdfFactory trial version www.pdffactory.com

283. Ms. Green knew that the Plaintiff could not be reinstated in two weeks because she knew that only she could reinstate the Plaintiff and Ms. Green knew that she would be on vacation in two weeks, including the date on which she claimed the Plaintiff would be reinstated.

284. Ms. Green knew that the Defendant had no intention to reinstate the Plaintiff as a per diem RN.

285. The Defendant erroneously accused the Plaintiff of walking off the job.

286. The Defendant repeatedly failed to return the Plaintiff's telephone calls.

287. The Defendant denied the Plaintiff a position at the Defendant facility, after she had already been scheduled to work through an employment agency.

288. The Defendant sent an e-mail to the Plaintiff's employment agency prohibiting the Plaintiff from being assigned to the Defendant facility, thereby limiting the Plaintiff's employment prospects and damaging her reputation with her employment agency.

289. The Defendant discriminated against the Plaintiff on the basis of her disability by failing to reinstate the Plaintiff as a per diem RN.

290. The Defendant's conduct created an unreasonable risk of causing emotional distress.

291. The Defendant's conduct was extreme and outrageous.

292. The Plaintiff's distress was foreseeable.

293. The Defendant was aware that the Plaintiff suffers from Bipolar Disorder.

294. As a mental health facility, the Defendant knew that one major manifestation of Bipolar Disorder is persistent and unremitting thoughts of self-harm and suicide.

PDF created with pdfFactory trial version www.pdffactory.com

295.   The Defendant, aware of the Plaintiff's condition, reasonably should have foreseen that its actions would result in emotional distress to the Plaintiff.

296.   The Plaintiff suffered emotional distress.

297.   The emotional distress was severe enough to result in illness or bodily harm.

298.   The Defendant's conduct was the cause of the Plaintiff's emotional distress.

299.   As a result of the Defendant's unlawful conduct, the Plaintiff has suffered severe emotional and psychological stress, distress, anxiety and loss of the ability to enjoy life's pleasures and activities.

300.   The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.


**Count Thirteen:**          **Libel**

301.   The Plaintiff hereby incorporates paragraphs one through sixty-eight as if more fully set forth herein at length.

302.   As a means of employment during the Plaintiff's anticipated return to work as a per diem RN, the Plaintiff began working through a job placement agency, Maxim.

303.   One of the Plaintiff's assignments from Maxim was an RN position at the GBCMHC.

304.   However, before the Plaintiff reported for the assignment at GBCMHC, a representative from Maxim telephoned her and informed her that her shift had been cancelled.

305.   The Plaintiff was further advised by the Maxim representative that Irvin Pemberton sent an e-mail to Maxim stating, "Please be advised effective immediately, Lee Siuzdak is not to be used as an RN in the building.  Should there be any question

34

PDF created with pdfFactory trial version www.pdffactory.com

relating to this matter contact Gary Siegel in HR department."

306. This statement is false.

307. This e-mail constitutes a written publication to a third party.

308. No explanation was provided for this e-mail.

309. Despite numerous telephone calls, made by the Plaintiff, to Mr. Siegel, Mr. Pemberton, and Ms. Green, no action was taken by the Defendant to correct the e-mail.

310. As a result of the e-mail sent to Maxim by Irvin Pemberton, and the lack of further clarification or correction, the Plaintiff's reputation was damaged.

311. The statement made by Mr. Pemberton in the e-mail injured the Plaintiff in her profession or calling.

312. As a result of the foregoing unlawful conduct, the Plaintiff suffered and will continue to suffer damages including, but not limited to, lost wages and benefits and reputation damage.

313. The Plaintiff seeks damages as a result of the Defendant's unlawful conduct.

PDF created with pdfFactory trial version www.pdffactory.com

## **Prayer for Relief**

Where forth Plaintiff prays:

1.      That this Court retain and maintain jurisdiction over this matter.

2.      That this Court award punitive damages pursuant to statutory authority.

3.      That this Court award damages pursuant to Connecticut common law.

4.      That this Court award attorney's fees, expert witness fees, and costs.

5.      That this Court grant Plaintiff a trial by jury.

6.      That this Court grant such other and further relief as equity may appertain.


Plaintiff,
LEE SIUZDAK


By: _____
Eugene N. Axelrod, Esq. (ct 00309)
The Employment Law Group
8 Lunar Drive

36

PDF created with pdfFactory trial version www.pdffactory.com

Woodbridge, CT   06525
Tel: (203) 389-6526
Fax: (203) 389-2656
Her Attorney

PDF created with pdfFactory trial version www.pdffactory.com